UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | |
|---|---|
| HAROLD PERSAUD | ) JUDGE: DONALD C. NUGENT |
| | ) |
| Movant, | ) CRIMINAL CASE NO.: 1:14CR-00276 |
| -vs- | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) CIVIL CASE NO.: _____ |
| | ) |
| Respondent. | ) |

**MEMORANDUM IN SUPPORT OF HAROLD PERSAUD'S
MOTION TO VACATE AND SET ASIDE JUDGMENT OF CONVICTION AND
SENTENCE PURSUANT TO 28 UNITED STATES CODE SECTION 2255**

I.      BACKGROUND

Movant herein, Dr. Harold Persaud, is a former Interventional Cardiologist who was convicted of Health Care Fraud, Making False Statements Relating to Health Care Matters, and Monetary Transactions in Property Derived from Criminal Activity following a jury trial before this Honorable Court.  Dr. Persaud was sentenced to 20 years in prison.  Because of his criminal convictions, Dr. Persaud has lost his liberty, family, livelihood, and reputation.

The criminal case against Dr. Persaud was based on claims that he performed unnecessary medical tests and procedures; falsified medical records; performed certain medical tests improperly; utilized inappropriate cardiac testing; falsified test results; and up-coded the services he provided patients, for monetary gain.  The Government's criminal claims followed a negative peer review and civil investigation opened by the hospitals at which Dr. Persaud had enjoyed privileges.  Notwithstanding the overall *subjectivity* of the practice of medicine, and the need for an individual's treating physician to use his or her skill and experience in making necessary judgments regarding that individual's treatment, the Government decided that Dr. Persaud should be prosecuted criminally based upon the *subjective* interpretations, analysis, and

1

judgments he made within the course of his private medical practice.  The Government claimed Dr. Persaud's subjective interpretation and alleged misreading of the levels of stenosis (arterial blockage) found in his patients constituted *materially false statements*.  Despite the irregularity of medical analysis and the accepted concept of "interobserver variability"[1] the Government considered <u>*Dr. Persaud's subjective medical statements and opinions as criminally false*</u>, rather than possible proof of negligence or malpractice.  Indeed, the inherent subjectivity of medical "statements" makes the task of *proving* or *disproving* them, almost impossible.  Imposing criminality upon a physician's subjective judgments and stretching to somehow quantify what is an "acceptable" level of "inter-observer variability" confounds the Government's burden to prove "knowingly" and "willfully" (as they relate to Health Care Fraud, False Statements, and Money Laundering) by proof *beyond a reasonable doubt*.

The Government's use of multiple physician witnesses, essentially presenting each of them as "experts" or otherwise eliciting improper "lay" opinion testimony from them, was an unfair, inappropriate effort to show or infer the alleged falsity of Dr. Persaud's subjective medical interpretations.  The Government presented many physician witnesses who disagreed with Dr. Persaud's medical determinations in an effort to convince the jury that Dr. Persaud's *subjective* judgments were *false* and that his actions were criminal.   In so doing, the Government failed to meet its burden to prove the elements of the crimes charged and <u>violated due process</u>.

The case against Dr. Persaud included evidence concerning complicated medical concepts and modalities along with scientifically-sophisticated testimony from many, many physicians, who testified at length about *cardiac care, medical testing standards, and "medically necessary" versus "non-medically necessary" procedures*.  Each of the physician witnesses

---

[1] This concept recognizing some subjectivity in doctors' medical analysis and findings was acknowledged by the Government and the defense during trial.

presented by the Government gave <u>extensive expert opinion testimony</u> related to the criminal allegations against Dr. Persaud.[2] [3]

The insurance industry's increasingly domineering control over the medical profession helped make the Government's prosecution successful. The Government presented "expert" testimony regarding complex Medicare/insurance billing requirements and protocol which set the stage for the Government's determining what procedures were "warranted" and "should have" been billed, and what procedures "were not". After application of statistical analysis and variant extrapolation, such billing requirements formed the basis of the calculations for the alleged "amount of loss" which was an integral part of determining Dr. Persaud's sentence.

During trial, it became apparent that Dr. Persaud was not the most popular cardiologist practicing at St. John's Westshore Hospital, Southwest General Hospital, or Fairview Hospital. He was likely less social than many of his peers. Within his professional practice, Dr. Persaud could fairly be described as "all-business". He was proactive and aggressive in the treatment of his cardiac patients. Dr. Persaud was purposeful during his testing and examinations. He was determined to catch and appropriately treat stenosis where it existed in his patients, to ensure adequate blood flow and avoid any further heart damage, or fatality. During office visits, Dr. Persaud was more interested in completing patients' examinations than he was in making small talk or engaging in casual chit-chat. Although Dr. Persaud spent time seeing his many patients,

---

[2] The Government treated all of its physician witnesses as "experts" eliciting technical, scientific "opinion" testimony from each regarding the alleged "falsity" of Dr. Persaud's practices, without substantiating that they were qualified and that their methodology and proposed testimony was appropriate under FRE 702. The Government's entire case was comprised of "opinion" testimony regarding the alleged *medical practice failures* of Dr. Persaud, and the *falsity* of his stenosis readings, from physician witnesses who had not been qualified under FRE 701 and/or who were permitted to give opinion testimony in violation of FRE 701.

[3] The Government also introduced a multitude of exhibits, pictures, illustrations, videos, documents, power point presentations, charts, publications, spreadsheets, testimony, and other "evidence" to prove its complex, scientific case against Dr. Persaud.

he was not prone to kid around and certainly did not hold back letting patients know when he thought their eating habits or life-style choices were the cause of their health problems.  Dr. Persaud could be quite blunt in communicating with patients, staff, and colleagues.  He believed in being frank, especially when doing so could change a patient's views, habits, and perspective, and, for some patients, might save their lives.  Frankness and lack of diplomacy, however, are not crimes.  Since he prided himself on efficiency, Dr. Persaud did not approve of his office employees or hospital staff wasting time or taking unnecessary breaks.

Dr. Persaud was knowledgeable and was self-assured about his own professional skills, training, and experience.  He expected high performance from those he worked with.  Dr. Persaud may have abided by more traditional treatment methods than some of his colleagues, but that did not stop him from telling young doctors when he thought their opinions were wrong or when he believed his years of experience trumped their newer, less tested methods and procedures, which to him, at times, seemed dictated by insurance companies.  Dr. Persaud's straightforwardness, and stern insistence that his patients follow his recommendations, ultimately led to his downfall, however, because when the wave of criticism started to rise against him, colleagues, co-workers, and former employees, who may have been on the receiving end of Dr. Persaud's directness and lack of diplomacy refused to speak up for him.

II.    CASE OVERVIEW

In the instant case, the Government charged Dr. Persaud with Health Care Fraud (18 U.S.C. §1347- Count 1), Making False Statements Relating to Health Care Matters (18 U.S.C. §1035 - Counts 2-15) and Engaging in Monetary Transactions in Property Derived from Criminal Activity (18 U.S.C. §1957 - Count 16).  Dr. Persaud plead not guilty to all charges and the matter proceeded to a jury trial on August 31, 2015.

A.  GOVERNMENT BOMBARDED JURY WITH *EXPERTS* AND *OPINIONS*

At trial, the evidence and testimony admitted through the many physician witnesses called by the Government comprised the bulk of the case presented to the jury.  Although each physician witness gave testimony regarding *scientific*, *technical*, and other *specialized* issues, none of the doctors presented by the Government during trial, not those identified as "expert" witnesses, nor those identified as "lay" witnesses, were properly qualified to testify under Evidence Rule 702.  Furthermore, the testimony of the Government's "billing" expert should also have been subject to review under FRE 702 before it was presented to the jury.  The Government elicited prejudicial testimony from its numerous "experts" using mostly leading questions, to which defense counsel did not object.  In allowing the Government to engage in a trial-long pattern of asking its legion of physician witnesses leading questions, this Court failed its obligations under FRE 611(c).

In relation to its Health Care Fraud and False Statement charges, the Government presented a complex case.  The Government's case included the presentation of cumulative medical testimony related to procedures, techniques, accepted parameters of diagnosis, professional guidelines, and defined methodology for measuring levels of stenosis through various testing procedures, including intravascular ultrasound ("IVUS") and fractional flow reserve ("FFR").  The Government's false statement charges specifically relied upon its claims that Dr. Persaud intentionally inflated his patients' levels of stenosis.  The Government also presented a billing and coding expert who explained medical billing requirements to the jury and otherwise testified about her "analysis" and critique of Dr. Persaud's billing records.  In its case-in-chief, the Government presented 34 witnesses, including 11 doctors, four nurses, and eight patients.  Dr. Persaud was convicted of all but one false statement charge.

Dr. Persaud appealed his convictions to the Sixth Circuit Court of Appeals.  The Sixth Circuit issued its Decision *Affirming* Dr. Persaud's convictions on June 13, 2017.

B.  "EXPERT" WITNESSES NOT PROPERLY QUALIFIED UNDER FRE 702

Dr. Persaud's trial counsel were deficient because they did not challenge the qualifications or methodology[4] of the Government's "expert" witnesses under FRE 702 (Dr. Ian Gilchrist, Dr. Robert Biederman, and Sonda Kunzi).  Dr. Persaud's defense counsel also failed to challenge the "relevance", "admissibility", and "fit" of such "expert" witnesses' proposed testimony, and how such testimony could be properly offered to show the *falsity* of Dr. Persaud's *subjective judgments*.  In failing to object and insist on an opportunity to *voir dire* these "expert" witnesses, defense counsel conceded these witnesses' qualifications and lost the ability to challenge the weight, relevancy, and admissibility of the testimony given, as required under the Federal Rules of Evidence and the Supreme Court's determinations in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  Dr. Persaud's trial counsel were constitutionally deficient.  Appellate counsel were likewise deficient in failing to raise this error, and failing to raise the unsupported "amount of loss" issues on appeal.

C.  "LAY" WITNESSES' OPINION TESTIMONY IN VIOLATION OF FRE 701

Movant's trial counsel were furthermore constitutionally deficient in failing to object to the extensive *expert* and *opinion* testimony given by the six medical doctor witnesses (Dr. John Coletta, Dr. Michael Dobrovich, Dr. Hiram Bezerra, Dr. Barry George, Dr. John Letcher, and Dr. John Cacchione) called by the Government purportedly as "lay" witnesses.  Sitting silently while the Government utilized leading questions to elicit what clearly constituted expert analysis,

---

[4] There was no challenge to the manner in which "samples" of patient files were chosen, the means for extrapolating findings from such non-random samples, the method by which the witnesses determined that Dr. Persaud's interpretations were actually "false", or the reliability of the analysis relied upon.

conclusions, and opinion testimony from these witnesses, trial counsel were constitutionally deficient.  Appellate counsel were deficient in not raising such errors on appeal.  Dr. Persaud suffered actual prejudice as the result of these deficiencies.  The errors resulting from this barrage of unqualified, untested expert and impermissible opinion testimony targeting Dr. Persaud, admitted without objection, are obvious and extraordinary.

III.     HABEAS CORPUS STANDARD

Pursuant to Title 28 United States Code Section 2255, this Honorable Court "shall vacate and set the judgment aside" if it finds "that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." 28 U.S.C. § 2255(b). To obtain relief under 28 U.S.C. § 2255, a petitioner must demonstrate "(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law...so fundamental as to render the entire proceeding invalid." Short v. United States, 471 F.3d 686, 691 (6th Cir. 2006) (*quoting* Mallett v. United States, 334 F.3d 491, 496-97 (6th Cir. 2003)).  The petitioner "must clear a significantly higher hurdle than would exist on direct appeal" and establish a "fundamental defect in the proceedings which necessarily results in a complete miscarriage of justice or an egregious error violative of due process." Fair v. United States, 157 F.3d 427, 439 (6th Cir. 1998).  *See, also,* Gall v. United States, 21 F.3d 107, 109 (6th Cir. 1994).  This Honorable Court has jurisdiction over the issues raised herein pursuant to 28 U.S.C. § 2255.  A federal district court may grant relief to a prisoner in custody only if the petitioner can "demonstrate the existence of an error of constitutional magnitude[5] which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict." Griffin v. United States, 330 F.3d 733, 736 (6th Cir. 2003).

_____

[5] The parade of experts attacking Dr. Persaud had an injurious effect on the proceedings and the jury's verdict.

In the instant case, Dr. Persaud submits that his judgment of conviction and sentence should be vacated and set aside based upon the fundamental defects which occurred at trial because of the errors of his counsel. In addition, the sentence imposed was illegal based upon incorrect calculations and unsupported conclusions regarding "amount of loss". These significant errors are of constitutional magnitude.[6] In reviewing Dr. Persaud's Habeas Corpus Petition, this Honorable Court is asked to look at the entirety of the trial proceedings and determine *inter alia.,* that such are invalid based upon fundamental errors in law; the violation of Dr. Persaud's constitutional rights; the *constitutional deficiency* of Dr. Persaud's trial and appellate counsel; and, the resulting actual prejudice he has suffered.

IV.     GROUNDS FOR RELIEF
          *GROUND ONE:*
          *UNTESTED, UNQUALIFIED "EXPERT" TESTIMONY AND*
          *IMPERMISSIBLE OPINION TESTIMONY WAS ADMITTED AT*
          *TRIAL THROUGH INDIVIDUALS IDENTIFIED BY THE*
          *GOVERNMENT AS "EXPERT" WITNESSES AND INDIVIDUALS*
          *IDENTIFIED AS "LAY" WITNESSES, AS THE RESULT OF*
          *COUNSEL'S INEFFECTIVE ASSISTANCE*

A.     UNDER THE STRICKLAND STANDARD COUNSEL WERE DEFICIENT

The constitutional right to counsel guarantees the "effective assistance" of counsel, and a defendant's constitutional rights have been denied when he receives ineffective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). "An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair." Id. at 685. To establish ineffective assistance of counsel under the

---

[6] Dr. Persaud incorporates his claims of constitutional error relative to the admission of hundreds of Government exhibits through the "expert" and "lay" physician witnesses presented (without objection by counsel) and requests an opportunity to further detail the inadmissibility of such exhibits at any future hearing, based upon the fact that the witnesses gave *either* impermissible "lay" opinion testimony *and/or* impermissible "expert" testimony without first being accepted as qualified to testify under FRE 702 and the law in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)), as further detailed *infra.*

Strickland standard, a defendant must make two showings. First, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 688. Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome," Id. at 694. "Unless a defendant makes both showings, it cannot be said that the conviction … resulted from a breakdown in the adversary process that rendered the result unreliable." Strickland, 466 U.S. at 687. The same elements are required in relation to claims of ineffective assistance of appellate counsel. *See,* Evitts v. Lucey, 469 U.S. 387, 396 (1985); Mapes v. Tate, 388 F.3d 187, 191 (6th Cir.2004). According to Strickland, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case," Id. at 693. According to Strickland, a defendant claiming ineffective assistance of counsel must demonstrate both *constitutionally deficient performance* by counsel and *actual pre*judice because of the alleged deficiency. *See*, Williams v. Taylor, 529 U.S. 390, 390-91 (2000).

At trial, there was insurmountable prejudice due to the scientific complexity of the charges against Dr. Persaud in relation to the alleged *falsity* of his *subjective* medical interpretations, analysis, and judgments. Absent objection by the defense, the Government presented its alleged "proof" of Dr. Persaud's "false statements" through its multiple "expert" and "lay" physician witnesses.[7] These many doctors gave testimony about their opinions of what they observed in the medical records, but that did not establish that Dr. Persaud's medical judgments were "false statements" within the context of the Health Care Fraud and False

---

[7] This Honorable Court is requested to review and consider the observations of the United States District Court for the Eastern District of Kentucky in a recent similar case, United States v. Paulus, 2017 WL 908409, relative to issues of alleged falsity and challenges to "opinions" rendered concerning the **subjective medical judgments**. (See Appendix B attached.)

Statement charges.[8]  Rather, the effect of presenting cumulative testimony from so many

"experts" essentially forced the jury to conclude that, "if so many "expert" doctors say Dr.

Persaud's *interpretations* were so obviously wrong, Dr. Persaud's *interpretations* had to then be

*"false"* and not the result of an "error" or some "mistake"."  In failing to raise this issue and

object to the admissibility of all such witnesses' proposed testimony under FRE 701, FRE 702,

and the principals set forth by the United States Supreme Court in Daubert v. Merrell Dow

Pharmaceuticals, Inc., 509 U.S. 579 (1993), Dr. Persaud's counsel were constitutionally

defective.  Moreover, defense counsel's failure to object to the Government's continual use of

leading questions which allowed the Government to "testify", and this Court's not exercising

control over the proceedings (in violation of FRE 611[9]) undoubtedly altered the outcome of the

trial, rendering the proceedings fundamentally defective.  Dr. Persaud suffered actual prejudice

because of the errors of his counsel and the resulting defects in the proceedings.

> B   TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE IN FAILING TO
> CHALLENGE THE GOVERNMENT'S "EXPERT" WITNESSES AND THEIR
> PROPOSED TESTIMONY AS REQURED UNDER THE FEDERAL RULES OF
> EVIDENCE AND DAUBERT V. MERRILL DOW PHARMECEUTICALS, INC.,
> 509 U.S. 579 (1993)

Federal Rules of Evidence 701, 702, and 703 govern the admission of **expert testimony**

and **opinion testimony**.  The admissibility of expert testimony is governed by Federal Rule of

Evidence 702 which states:

> RULE 702.  Testimony by Expert Witnesses
> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise if:
>   (a) the expert's scientific, technical, or other specialized knowledge will

---

[8] The Sixth Circuit Court of Appeals has held that a false statement is a "factual assertion" capable of "confirmation or contradiction".  *See,* Williams v. United States, *458 U.S. 279, 284 (1982)* and United States v. Kurlemann, 736 F.3d 439, 445 (6th Cir. 2013).

[9] As illustrated in the numerous transcript excerpts included in Section C, *infra.* and in the attached Appendix A, the Government itself became a witness against Dr. Persaud, providing scientific testimony while posing leading questions.

help the trier of fact to understand the evidence or to determine a fact in issue;
 (b) the testimony is based on sufficient facts or data;
 (c) the testimony is the product of reliable principles and methods; and
 (d) the expert has reliably applied the principles and methods to the facts of
the case.

In determining whether expert testimony is appropriate under Rule 702, courts must utilize a two-part test.  First, is the expert qualified and the testimony reliable? And, second, is the scientific evidence relevant and helpful to the trier of fact?  *See,* United States v. Jones, 107 F.3d 1147, 1156 (6th Cir. 1997).

  1. Is Expert Qualified and the Testimony Reliable?

The seminal case applying the **first part** of the test required under Rule 702 is Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), wherein the U.S. Supreme Court explained that the district court was the **"gatekeeper"** entrusted with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, at 597.

In Daubert, the Supreme Court also made a point of noting that regarding the admissibility of purportedly scientific evidence, ". . . under the Rules [of Evidence] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.", Daubert, at 589.  Under FRE 702, an expert may testify relative to his or her ". . . scientific, technical, or other specialized knowledge" if such "will assist the trier of fact to understand the evidence or to determine a fact in issue."  In Daubert, the United States Supreme Court noted the following:

> The adjective "scientific" implies a grounding in the methods and procedures of science.  Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation.  The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.  *Webster's third New International Dictionary 1252 (1986).*

Daubert, at 589-590.

In *Daubert,* the Supreme Court listed several specific factors to help determine the reliability of expert testimony based on scientific knowledge. The *Daubert* Court noted the importance of, *inter alia.,* whether a scientific theory that is the subject of expert testimony can be "tested", whether it has been subject to "peer review and publication", and whether a particular "scientific technique" has a known or potential error rate. Id, at 592-594.

In the instant case, the defense failed to object to the Government's presentation of multiple "experts" and the *leading* manner in which the Government elicited testimony concerning Dr. Persaud's alleged Health Care Fraud and False Statements. There was no *voir dire* and no inquiry into the qualifications or methodology utilized by the many physicians who testified. Further, there was no inquiry to determine whether the proposed testimony actually "fit" the issues in the case and/or whether it would be helpful to the jury. The "experts" were all accomplished physicians. This does not make them experts, nor allow them *automatic* opinions.

### 2. Is Scientific Evidence Relevant and Helpful to the Trier of Fact?

Regarding the **second part** of the test required under Rule 702, the <u>Daubert</u> Court looked carefully at the importance of the need to ensure that evidence admitted would assist the trier of fact, and stated:

> Rule 702 further requires that the evidence or testimony "**assist the trier of fact to understand the evidence or to determine a fact in issue."** This condition goes primarily to **relevance.** "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." 3 Weinstein & Berger ¶ 702[02], p. 702–18. *See also* <u>United States v. Downing</u>, 753 F.2d 1224, 1242 (CA3 1985) ("An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute"). The consideration has been aptly described by Judge Becker as one of "fit." *Ibid.* "Fit" is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. *See* Starrs, *Frye v. United States Restructured and Revitalized: A Proposal to Amend Federal Evidence Rule 702*, 26 Jurimetrics J. 249, 258 (1986). The study of the

phases of the moon, for example, may provide valid scientific "knowledge" about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night. Rule 702's "helpfulness" standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

Daubert, at 591-592. (Emphasis added.)

In Daubert, the United States Supreme Court detailed this Honorable Court's duties as "gatekeeper" in connection with making inquiry to determine whether a particular witness is qualified to give expert scientific testimony in accordance with the requirements of Evidence Rule 702 and Evidence Rule 104(a). Specifically, the Court in Daubert held:

Faced with a proffer of expert scientific testimony, then, **the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge** that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary **assessment of whether the reasoning or methodology underlying the testimony is scientifically valid** and of **whether that reasoning or methodology properly can be applied to the facts in issue**. We are confident that federal judges possess the capacity to undertake this review. Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test. But some general observations are appropriate.

Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested. **"Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry."** Green 645. See also C. Hempel, Philosophy of Natural Science 49 (1966) ("[T]he statements constituting a scientific explanation must be capable of empirical test"); K. Popper, Conjectures and Refutations: The Growth of Scientific Knowledge 37 (5th ed. 1989) ("[T]he criterion of the scientific status of a theory is its falsifiability, or refutability, or testability") (emphasis deleted).

**Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication**. Publication (which is but one element of peer review) is not a sine qua non of admissibility; it does not necessarily correlate with reliability, see S. Jasanoff, *The Fifth Branch: Science Advisors as Policymakers* 61–76 (1990), and in some

instances well-grounded but innovative theories will not have been published, *see* Horrobin, *The Philosophical Basis of Peer Review and the Suppression of Innovation*, 263 JAMA 1438 (1990). Some propositions, moreover, are too particular, too new, or of too limited interest to be published. But submission to the scrutiny of the scientific community is a component of "good science," in part because it increases the likelihood that substantive flaws in methodology will be detected. *See* J. Ziman, Reliable Knowledge: An Exploration of the Grounds for Belief in Science 130–133 (1978); Relman & Angell, *How Good Is Peer Review?,* 321 New Eng.J.Med. 827 (1989). The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised.

   **Additionally, in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error**, see, e.g., United States v. Smith, 869 F.2d 348, 353–354 (CA7 1989) (surveying studies of the error rate of spectrographic voice identification technique), and the existence and maintenance of standards controlling the technique's operation, see United States v. Williams, 583 F.2d 1194, 1198 (CA2 1978) (noting professional organization's standard governing spectrographic analysis), *cert. denied*, 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979).

   Finally, "general acceptance" can yet have a bearing on the inquiry. A "reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community." United States v. Downing, 753 F.2d, at 1238. *See also* 3 Weinstein & Berger ¶ 702[03], pp. 702–41 to 702–42. Widespread acceptance can be an important factor in ruling particular evidence admissible, and "a known technique which has been able to attract only minimal support within the community," Downing, 753 F.2d, at 1238, may properly be viewed with skepticism.

Daubert, at 592-595. (Emphasis added.)

   In the instant case, there was no proper assessment of the reasoning or methodology of the Government's "experts". At trial, other than establishing the credentials of their many physician witnesses, the Government did not demonstrate for the Court through *voir dire* that such witnesses' scientific knowledge would *assist the jury*. Further, the Government did not demonstrate that the witnesses' testimony was: *based on sufficient facts*, *the product of reliable principles and methods*; and that the witnesses *reliably applied such principles and methods to*

*the facts of the case*.  Satisfying each of these components is required under FRE 702.  This Honorable Court is obligated as "gatekeeper" to ensure that such inquiry is made.  *See*, Daubert, Id., at 592-593.  Since there was no objection, no *voir dire*, and no other inquiry made relative to the reasoning and methodology of the Government's physician witnesses, there is no way to determine whether their methodology was appropriate and whether their testimony was competent and admissible.  Listening to so many physician witnesses testify about complicated scientific matters, in connection with the alleged "falsity" of Dr. Persaud's subjective medical decisions, undoubtedly had a significant, negative, indelible impact on the jury.

Through the course of the trial, witness after witness.  The Government's technique on direct examination was to first elicit significant details regarding each witness' *background, education, training, experience, scholarship, licenses, certifications, specialties, professional society memberships, academic proficiency, publications, privileges, honors, awards, etc*., and then lead right into questions about the witnesses' work, opinions, and conclusions about the charges and allegations against Dr. Persaud.  There were no objections, no challenges, and no determinations through *voir dire* whether the witnesses were appropriately qualified and whether their testimony was admissible under FRE 702.  Indeed, there would have been more scrutiny of these physician witnesses, their qualifications, and their methodology if this had been a medical malpractice case!  Absent proper *voir dire* of these physician witnesses, Dr. Persaud and his counsel were left at a terrible disadvantage - facing an army of "experts".  Dr. Persaud's resulting conviction and sentence illustrate the extraordinary prejudice he suffered.

The Government's many "expert" and "lay" physician witnesses were permitted to testify in scientific detail regarding: cardiology, catheterization, stenosis, aortography, angiography, nuclear stress tests, stenting, medical standards, billing standards, and regarding the

15

failures of Dr. Persaud relative to each of these practices and procedures.  <u>Absent any proof of qualifications, *methodology,* and "fit", how could this testimony be considered competent and admissible under FRE 702 and Daubert?</u>  Indeed, there is a reasonable probability that, but for counsel's errors in allowing the admission such cumulative, overwhelming scientific testimony and their failure to request the Court to *voir dire* these "expert" witnesses, the result of the proceeding would have been different.

In <u>United States v. Neeley</u>, the Sixth Circuit Court of Appeals provided a thorough discussion of the application of <u>Daubert</u> to criminal cases.  The decision in <u>Neeley</u> makes clear that although the Government is permitted to present qualified witnesses, it is the responsibility of the trial judge to instruct the jury to ensure it knows how to properly consider, and not attribute too much weight, to such testimony.  Of course, it is the responsibility too of defense counsel to make objections, preserve error, and request a separate hearing if necessary.  Here, trial counsel were *constitutionally deficient* in failing to object and failing to request a *voir dire* pursuant to FRE 702 and <u>Daubert</u> relative to the Government's physician "experts" and its billing "expert"[10].  On appeal, counsel were deficient in failing to raise these errors and this Court's failure to discharge its duties as "gatekeeper".

At trial, the Government relied upon the following individuals identified as "expert" witnesses to lay the foundation of its case against Dr. Persaud:  Dr. Ian Gilchrist; Dr. Robert Biederman; and Sonda Kunzi, a medical coding expert.  Not only did these experts testify regarding the American College of Cardiology, the American Heart Association, and pertinent medical, billing, and professional guidelines, they also testified relative to practical field

---

[10] In <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999), the Supreme Court determined that the gatekeeping obligation and subsequent factors established in Daubert apply with equal force to non-scientific experts.

expectations, and *acceptable* medical standards for a variety of cardiac tests and procedures. Absent any effort to test their approach and methodology, these "experts" educated the jury without bounds regarding the Government's theory of the case; the medical tests and procedures at issue; and why Dr. Persaud's subjective medical judgments were "criminal".  Dr. Persaud had a constitutionally protected right to a fair trial.  That right was abrogated when the Government was permitted to present cumulative, prejudicial, "expert" testimony from unverified witnesses absent objection from defense counsel or inquiry by the Court under FRE 702 and Daubert.

The role of the "expert" witnesses presented by the Government at trial was immense; their testimony substantive.  The impact their cumulative expert testimony had on the jury, based upon the jury's verdicts, was significant.  A sample of the unchallenged "expert" witnesses' trial testimony is provided below.  In accordance with the Government's theory of the case against Dr. Persaud, these "expert" witnesses helped indoctrinate the jury as to what "medical necessity" was; which medical practices were proper; what scientific principles were to be relied upon; and, what "dangers" existed when a physician misread test results, overperformed, failed to perform, or otherwise practiced (as was claimed by the Government in the instant case) below or contrary to the medical standards declared "correct" by the Government.  Again, these non-tested witnesses helped convince the jury of the *falsity* of Dr. Persaud's *subjective medical interpretations*, *analysis, and judgments*.

### 3. "Expert" Testimony of Dr. Ian Gilchrist was Untested, Improper

Although he presented with impressive skills and background, the Government did not properly qualify Dr. Gilchrist to testify under FRE 702, nor did it demonstrate that his data and methodology were appropriate.  Defense counsel did not object; no *voir dire* was conducted.  Dr. Gilchrist testified at length regarding his expert report and explained to the jury his beliefs about

the proper diagnosis of Coronary Artery Disease.  (Ian Gilchrist Transcript (Doc #193, Page ID 5968))  Dr. Gilchrist explained when inserting a stent into a patient was considered "medical necessity" and when it was not. (Ian Gilchrist Transcript (Doc # 193, Page ID 5967-5970)).  Dr. Gilchrist explained the possible risks of heart damage resulting from placing a stent in a patient. (Ian Gilchrist Transcript (Doc #193 Page ID 5974).  Dr. Gilchrist also explained what occurred during a cardiac catherization procedure. (Ian Gilchrist Transcript (Doc #193, Page ID 5960).  Dr. Gilchrist described for the jury, using the Government's exhibits, what the narrowing of an artery actually looks like.  (Ian Gilchrist Transcript (Doc #193 Page ID 5985).  Dr. Gilchrist explained the purpose and limitations of a stent placed within a patient's artery (Ian Gilchrist Transcript (Doc #193, Page ID 5997-5999) and, also testified regarding possible adverse consequences, including rejection and possible heart attack (Ian Gilchrist Transcript (Doc #193, Page ID 6007-6009).  Dr. Gilchrist educated the jury about heart surgery and explained what a coronary bypass was, what the purpose of a coronary bypass was, and how such a surgery was performed. (Ian Gilchrist Transcript (Doc #193, Page ID 5968, 6090-6091).  Dr. Gilchrist told the jury that Dr. Persaud subjected his patients to unnecessary cardiac catheterization procedures when such patients did not have symptoms that warranted such medical procedures.  (Ian Gilchrist Transcript (Doc #194 Page ID 6028).  This testimony enforced the Government's theory that Dr. Persaud was an incompetent and brutal practitioner.  Hearing such shocking testimony from someone presented by the Government as an "expert" witness (someone inherently skilled and knowledgeable) was overwhelmingly prejudicial.

Dr. Gilchrist also gave unfounded, improper testimony that, since Dr. Persaud's used an insufficient amount of contrast material while conducting aortograms and ventriculograms, such tests had no diagnostic value except for purposes of billing.  (Ian Gilchrist Transcript (Doc #194,

Page ID 6051-6052).  Dr. Gilchrist reviewed a non-random sample of Dr. Persaud's patients.  In his expert report, Dr. Gilchrist concluded that <u>all stents</u> placed by Dr. Persaud in these patients, and <u>all aortograms</u>, <u>all angiograms</u>, and 70% of the catheterizations performed were "medically unnecessary."  Dr. Gilchrist testified at length regarding the inappropriateness of the tests and procedures performed by Dr. Persaud on his patients. (Ian Gilchrist Transcript (Doc #193, Page ID 6001-6007).  Obviously, Dr. Gilchrist's conclusions and his prejudicial testimony as an "expert" was relied upon by the jury and devastating to the defense.  Dr. Gilchrist was deemed an "expert" but was never properly subject to *voir dire* and accepted as qualified by this Court under FRE 702 and <u>Daubert</u>.  Dr. Gilchrist's testimony should not have been allowed.

### 4. "Expert" Testimony of Dr. Robert Biederman was Untested, Improper

Dr. Biederman, a cardiologist from Pittsburgh, Pennsylvania, with an extensive resume and many years of experience, was not properly qualified to give testimony under 702 and <u>Daubert</u>.  Defense counsel did not object; no *voir dire* was conducted.  Like Dr. Gilchrist, Dr. Biederman prepared an expert report, testified at length regarding nuclear stress tests, electrocardiograms, stress tests, and his opinions about the protocols and requirements for performing same.  Dr. Biederman testified at length regarding the practice of cardiology.  He explained complex procedures, the reasons for such procedures, and the requirements to perform such medical procedures "appropriately".  Dr. Biederman testified regarding what he believed were certain risks involved in cardiac catherization (Robert Biederman Transcript (Doc # 193 Page ID 5752)).  Dr. Biederman told the jury that nuclear stress tests required that a patient be subject to regular EKG readings during the test as a safety measure (Robert Biederman Transcript (Doc #193 Page ID 5708-5709), a requirement the Government contended Dr. Persaud failed to do. Dr. Biederman criticized Dr. Persaud's practices.  After the Government

presented assertions that Dr. Persaud failed to take blood pressure readings during nuclear stress tests, "expert" witness Dr. Biederman testified that failing to do so was contrary to what was "accepted protocol".  (*See,* Robert Biederman Transcript (Doc #193 Page ID 5708-5709).  Dr. Biederman was critical of doctors who did not follow the protocol he described for the jury.

Dr. Biederman disparaged Dr. Persaud's practice of performing echocardiograms during nuclear stress tests.  The Government claimed that Dr. Persaud's doing so was solely to bill for a separate procedure.  Dr. Biederman told the jury that subjecting a patient to an echocardiogram during a nuclear stress test was contrary to accepted medical practice.  Very specifically, he testified that there was "…absolutely zero criteria to suggest that you do that.  In fact, criteria specifically says its one or the other." (Robert Biederman Transcript (Doc #193 Page ID 5854)).

In Dr. Biederman's expert report, he detailed his review of the *non-random sample* of 10 patient files and corresponding nuclear stress tests supplied by the Government.  Dr. Biederman's opinions relative to his review of such files misled and prejudiced the jury.  Dr. Biederman concluded that of the 21 nuclear stress tests he reviewed, he found 16 if them to be "medically unnecessary" and further found that 15 of Dr. Persaud's referrals for catherization were "medically unnecessary."   Dr. Biederman's report also found that Dr. Persaud continually misinterpreted the results of the nuclear stress tests he performed.  Dr. Persaud appeared nothing short of incompetent by the end of Dr. Biederman's "expert" analysis.  Such unqualified, unchallenged expert testimony was devastating to Dr. Persaud and should not have been permitted under FRE 702 and <u>Daubert</u> absent inquiry and *voir dire* by counsel and this Court.

5. <u>"Expert" Testimony of Sonda Kunzi was Untested, Improper</u>

Much like the Government's "expert" physician witnesses, the Government's "expert" billing/coding witness was not properly qualified by the Government to testify under FRE 702

and <u>Daubert</u>, and was not subject to any *voir dire* or other inquiry.  Defense counsel did not

object.  The testimony of Ms. Kunzi, was critical to the Government's case and its allegations

that Dr. Persaud had lied in his billing and improperly "up-coded" the services he provided to his

patients.  Ms. Kunzi, testified at length regarding her complex, multifaceted analysis of Dr.

Persaud's patient billing

      Ms. Kunzi's methodology was never questioned, yet she testified at length concerning

her review of Dr. Persaud's billing.  She prepared a 697-page "expert" report of her findings.

Ms. Kunzi dissected 294 patient "encounters" of the same non-random sample of 10 patients that

were reviewed by the "expert" cardiologists.  Incredibly, Ms. Kunzi found that all 294

"encounters" were overbilled or "upcoded" by Dr. Persaud.  (Sonda Kunzi Transcript (Doc #190

Page ID 4871.)  Ms. Kunzi testified that Dr. Persaud almost always billed for patient services at

the highest level.  (Sonda Kunzi Transcript (Doc #190 Page ID 4780-4781).  Ms. Kunzi found

problems on every single bill she reviewed in connection with the 10-patient sample.  <u>Although

she is not a medical doctor</u>, Ms. Kunzi was permitted to tell the jury that the cardiac treatment

Dr. Persaud's provided to the subject patients, over the course of a seven-year period, never

warranted medical services which would call for insurance billing at the highest level.  (Sonda

Kunzi Transcript (Doc #190 Page ID 4780-4781).  In accordance with the Government's theory

of the case, Ms. Kunzi, advised the jury what she considered acceptable billing practices.  Ms.

Kunzi testified as to what was allowed and what was not allowed.  Ms. Kunzi determined, and

was permitted to testify that Dr. Persaud's billing was One Hundred Percent (100%) incorrect.  It

is difficult to imagine that such testimony would not have had a negative impact on the jury.  Ms.

Kunzi's analysis supported the "amount of loss" total relied upon by the Government, the

probation department, and this Court, for purposes of sentencing.

The Government elicited specialized, technical and scientific testimony, opinion testimony and prejudicial conclusions regarding Dr. Persaud conduct from the above three purported "expert" witnesses.  Unbelievably, such overwhelming and damaging "expert" testimony (and the qualifications of the purported "experts" giving such testimony) went untested, without challenge or objection, as required under FRE 702 and <u>Daubert</u>.  It is likely the jury would have returned a different verdict had it not been exposed to such overwhelming and complex testimony.

    C.   <u>TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE IN FAILING TO CHALLENGE THE GOVERNEMNT'S "LAY" WITNESSES WHO CLEARLY GAVE EXPERT TESTIMONY AND IMPERMISSIBLE OPINION TESTIMONY AT TRIAL</u>

Federal Rules of Evidence 701, 702, and 703 govern the admission of expert testimony and opinion testimony.  Much like they did with their "expert" witnesses, the Government elicited detailed information regarding the *backgrounds, education, training, experience, scholarship, licenses, certifications, specialties, professional society memberships, academic proficiency, publications, journals, residencies, privileges, honors, awards, etc.*, from their purported "lay" witnesses.  Such questioning effectively "qualified" each of these "lay" witnesses as "expert" from the standpoint of the jury.  After so presenting each of these "lay" physician witnesses, the Government then proceeded to elicit unquestionably "specialized", "expert" testimony from each of these doctor witnesses through its leading examination.  Such expert testimony included explanations of "appropriate" medical procedures, analysis and opinions of how "acceptable" procedures were performed, and why the procedures Dr. Persaud performed were wrong and for fraudulent purposes.[11]  In the instant case, the jury was not able to

---

[11] The transcript references included herein are only a few examples of the overwhelming, untested "expert" testimony admitted during Dr. Persaud's criminal trial.  Counsel can present additional examples upon this Court's request and/or during any hearing or further opportunity to brief the issues addressed.

distinguish between the Government's "expert witnesses" and its "lay witnesses".

    1.   <u>Opinion Testimony from "Lay" Witnesses Improper under Rule 701 / Testimony was in fact "Expert" Testimony which was Subject to Rule 702 and Daubert and Therefore Inadmissible</u>

Indeed, all of the physician witnesses who testified against Dr. Persaud had very impressive qualifications.  They were all educated medical doctors.  That is the point.  These "lay" witnesses were permitted to give **expert opinion testimony** to the jury regarding coronary artery disease, complicated medical procedures, scientific concepts, treatment protocol, accepted standards of care, etc., <u>which would otherwise be reserved for a qualified expert who would have been required to be identified in advance of trial and to prepare a report pursuant to Rule 16 of the Federal Rules of Criminal Procedure</u>.  Defense counsel failed to object and challenge these witnesses and the Court failed in its "gatekeeper" role as defined in <u>Daubert.</u>

The Government's "lay" physician witnesses gave detailed **opinion testimony** regarding many of the Government's exhibits, including patient files, photographs, videos, analytical charts, medical standards, investigative reports, test results, etc.  The cumulative effect of so many well-educated, skilled, highly qualified, and obviously accomplished witnesses, giving opinion testimony regarding Movant Dr. Persaud's lack of skill, lack of knowledge, inability to diagnose, and incompetence was <u>overwhelming</u>.  Notably, the Government's "lay" witnesses were not testifying about their *personal* observations regarding a particular case or patient, within the normal course of their professional practice as might be allowed under FRE 701.  Rather, these witnesses testified <u>specifically regarding their review and investigation of Dr. Persaud's patient records for the purpose of making a determination as to hi</u>s *lack of* <u>skill and</u> *inappropriate* <u>methods, decisions, and practices</u>.  The sum of such testimony as amassed and presented to the jury was crushing.  The resulting prejudice Dr. Persaud suffered is indisputable.

2.  <u>Opinion Testimony from "Lay" Witnesses in violation of Rule 701</u>

Federal Rule of Evidence 701 governing opinion testimony, provides:

> RULE 701.  Opinion Testimony by Lay Witnesses
> If a witness is not testifying as an expert, testimony in the form of an
> opinion is limited to one that is:
> (a) rationally based on the witness's perception;
> (b) helpful to clearly understanding the witness's testimony or to
> determining a fact in issue; and
> **(c) not based on scientific, technical, or other specialized knowledge
> within the scope of Rule 702.** (Emphasis added.)

In the instant case, defense counsel's failure to object to the admission of such a massive

amount of scientific, technical, and other specialized knowledge as well as **opinions** from the

Government's "lay" medical doctor witnesses resulted in error of <u>constitutional magnitude.</u>

In <u>United States v. White</u>, 492 F.3d 380 (2007), a case with many similarities to the

instant case, the Sixth Circuit Court of Appeals noted the fact that the 2000 amendment to FRE

701, was for the purpose of foreclosing lay witness testimony "based on scientific, technical, or

other specialized knowledge". [12] In <u>White</u>, the Sixth Circuit Court of Appeals acutely observed:

---

[12] COMMITTEE NOTES ON RULES—2000 AMENDMENT (Emphasis provided):

Rule 701 has been amended **to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing**. Under the amendment, a witness' testimony must be scrutinized under the rules regulating expert opinion to the extent that the witness is providing testimony based on scientific, technical, or other specialized knowledge within the scope of Rule 702. See generally <u>Asplundh Mfg. Div. v. Benton Harbor Eng'g</u>, 57 F.3d 1190 (3d Cir. 1995). **By channeling testimony that is actually expert testimony to Rule 702, the amendment also ensures that a party will not evade the expert witness disclosure requirements set forth in Fed.R.Civ.P. 26 and Fed.R.Crim.P. 16 by simply calling an expert witness in the guise of a layperson**. *See* Joseph, Emerging Expert Issues Under the 1993 Disclosure Amendments to the Federal Rules of Civil Procedure , 164 F.R.D. 97, 108 (1996) (noting that "there is no good reason to allow what is essentially surprise expert testimony," and that "the Court should be vigilant to preclude manipulative conduct designed to thwart the expert disclosure and discovery process"). *See also* <u>United States v. Figueroa-Lopez</u>, 125 F.3d 1241, 1246 (9th Cir. 1997) (law enforcement agents testifying that the defendant's conduct was consistent with that of a drug trafficker could not testify as lay witnesses; to permit such testimony under Rule 701 "subverts the requirements of Federal Rule of Criminal Procedure 16 (a)(1)(E)").

The **amendment does not distinguish between expert and lay witnesses, but rather between expert and lay testimony**.  Certainly it is possible for the same witness to provide both lay and expert testimony in a single case. *See*, e.g., <u>United States v. Figueroa-Lopez</u>, 125 F.3d 1241, 1246 (9th Cir.

> In amending the Rule, the drafters intended to preclude a party from surreptitiously circumventing "the reliability requirements set forth in Rule 702 ... through the simple expedient of proffering an expert in lay witness clothing" and to "ensure[ ] that a party will not evade the expert witness disclosure requirements set forth in ... Fed.R.Crim.P. 16 by simply calling an expert witness in the guise of a layperson." Fed.R.Evid. 701 advisory committee's note (2000).

White, at 400-401. (Emphasis added.) *See also, supra.*

In further delving into the reasoning and purpose of Rule 701's amendment, the panel in

White provides a helpful explanation and model upon which "lay" opinion testimony can be

judged:

> To distinguish lay witness testimony from expert testimony, the Advisory Committee incorporated the Tennessee Supreme Court's treatment of the issue in State v. Brown, 836 S.W.2d 530, 549 (Tenn.1992). Under Brown, lay **testimony "results from a process of reasoning familiar in everyday life," whereas "an expert's testimony results from a process of reasoning which can be mastered only by specialists in the field."** Brown, 836 S.W.2d at 549 (citation omitted). Accordingly, a lay witness could testify, for example, that "a footprint in snow looked like someone had slipped, or that a substance appeared to be blood." Id. at 550 (internal citations omitted). **Yet, lay testimony is improper where it encompasses opinions that "call[ ] for specialized skill or expertise"—such as a paramedic's testimony that skull trauma caused the bruises on a victim's face.** Id. at 550. The distinction is far from clear in cases where, as here, a witness with specialized or technical knowledge was also personally involved in the factual underpinnings of the case. See United States v. Ayala–Pizarro, 407 F.3d 25, 28 (1st Cir.2005) (citation omitted) (observing that "[t]he line between expert testimony under Fed.R.Evid. 702 ... and lay opinion testimony under Fed.R.Evid. 701 ... is not easy to draw"); United States v. Cruz, 363 F.3d 187, 194 (2d Cir.2004) ("District courts must be

---

1997) (law enforcement agents could testify that the defendant was acting suspiciously, without being qualified as experts; however, the rules on experts were applicable where the agents testified on the basis of extensive experience that the defendant was using code words to refer to drug quantities and prices). **The amendment makes clear that any part of a witness' testimony that is based upon scientific, technical, or other specialized knowledge within the scope of Rule 702 is governed by the standards of Rule 702 and the corresponding disclosure requirements of the Civil and Criminal Rules.** The amendment is not intended to affect the "prototypical example[s] of the type of evidence contemplated by the adoption of Rule 701 relat[ing] to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences." Asplundh Mfg. Div. v. Benton Harbor Eng'g, 57 F.3d 1190, 1196 (3d Cir. 1995).

> especially vigilant in evaluating the admissibility of expert testimony where
> ...a [witness] is called on to testify as a fact witness but also functions as an
> expert.”); United States v. Perkins, 470 F.3d 150, 155 (4th Cir.2006)
> (citations omitted).

White, at 401 (emphasis added).

The staggering sum of testimony provided by the Government's purportedly “lay” physician witnesses consisted of either “expert” testimony disguised as “lay” testimony, or impermissible “lay” “opinion” testimony.  All such testimony was devastating to Dr. Persaud's case.  In permitting any such improper testimony, this Honorable Court failed as “gatekeeper”.  In not objecting to the admission of such testimony (whether viewed as untested “expert” testimony or impermissible “lay opinion” testimony), Dr. Persaud's counsel were ineffective and Dr. Persaud suffered actual prejudice as the result.

3.  Purported “Lay” Testimony of Dr. John Coletta was Improper

The Government presented the testimony of Dr. John Coletta, the Chairman of the Department of Cardiology at St. John's Westshore Hospital.  Dr. Coletta was the individual who started the hospital's investigation of Dr. Persaud, after he disagreed with the recommended treatment for a patient he was covering while Dr. Persaud was out of town.  Though presented as a “lay” witness by the Government, Dr. Coletta's otherwise inadmissible “opinion” testimony was clearly that of an “expert” witness.  Dr. Persaud's counsel failed to object to such testimony pursuant to Federal Rules of Evidence 701 and 702 as well as the law set forth in Daubert.  Although Dr. Coletta was the only lay witness personally involved in some of the cardiac treatment of (one of) Dr. Persaud's patients [RE], Dr. Coletta's testimony at trial extended entirely beyond his personal knowledge and the treatment of such patient.

While being questioned about the patient (RE) and his **conclusions** regarding the (alleged) improper manner in which Dr. Persaud performed an IVUS test and his (alleged)

incorrect measurement of stenosis, Dr. Coletta testified:

```
Q.   What did you conclude after you reviewed [RE's]
     IVUS images?
A.   So what I concluded was that the ultrasound that was
     performed all was performed within the guide
     catheter, the catheter that was passed along.  That
     the images were obtained from inside that and not
     inside the artery of question.
```
(John Coletta Transcript (Doc# 185, Page ID 3635)(emphasis
added.))

```
Q.   And you confirm that that's what [RE's]IVUS
     image was measuring was the guide catheter?
A.   That was my conclusion.
Q.   And it was not measuring anything  regarding his
     percentage of stenosis in any of his arteries, is
     that correct?
A.   Correct, because there were no arteries imaged. It
     was just the guide catheter.
```
(John Coletta Transcript (Doc# 185, Page ID 3636)(emphasis
added.))

In discussing his medical **findings of stenosis** upon his review of the patient's angiogram

and IVUS results, Dr. Coletta opined:

```
Q.   Thank you. And then you were discussing when you
     reviewed the angiogram and the IVUS images, what  did
     you conclude?
A.   I concluded that there were no severe blockages that
     were identified by the angiograms, so in my
     recollection there was no blockage of greater than
     50%, and that the IVUS images again were of no
     benefit to me in my further assessing that because
     they were performed within the guide catheter.
```
(John Coletta Transcript (Doc# 185, Page ID 3639-3640)(emphasis
added.)

Regarding his **opinion** as to the non-medical necessity and non-benefit of the cardiac

procedures performed by Dr. Persaud on the patient [RE], Dr. Coletta gave the following

opinion:

```
Q.   So based on this nuclear stress test of [RE],
     it would not have been a benefit to proceed to
```

27

```
                        intervention at the cath lab or a  stent or IVUS?
        A.      Based on the pictures in front of us, the perfusion
                images alone, there's no indication to bring the
                patient to the cath lab at this point.
(John Coletta Transcript (Doc# 185, Page ID 3646)(emphasis
added.)
```

In connection with his "investigation" and review of records for 11 of Dr. Persaud's

cardiac patients, Dr. Coletta made the following determinations:

```
        Q.      Out of those 11 images of Dr. Persaud's patients  for
                the past three months that you looked at, did you find
                that there were problems with any of them?
        A.      There were.
        Q.      How many different cases had problems?
        A.      There were seven sets of images that were very
                problematic.
        Q.      And when you say "problematic," can you elaborate
                what you mean by that, please?
        A.      Sure.  What I mean is that in seven of the eleven
                we looked at, the pictures of the IVUS or the
                ultrasound were all performed within the guide
                catheter, never entering the artery itself.
(John Coletta Transcript (Doc# 185, Page ID 3652)(emphasis
added.)
```

Dr. Coletta was asked about the **"diagnostic viability"** of the intravascular ultrasound

images obtained by Dr. Persaud for his patient [RE] and his **determinations relative to the most**

**critical matter at issue at trial, i.e.,** *percentage of stenosis* within the artery.  He concluded:

```
        Q.      And I think we talked about this yesterday, [RE]'s
                IVUS images, there was nothing diagnostically viable
                out of those images?
        A.      Correct.
        Q.      Would you have been able to assess any percentage of
                stenosis based on those views, readings?
        A.      No, we could not
(John Coletta Transcript (Doc# 177, Page ID 2115)(emphasis
added.)
```

When he was improperly questioned about his **opinion** regarding the **"clinical value"** of

the Dr. Persaud's use of intravascular ultrasound <u>and</u> the reason or "motive" for the methodology

used by Dr. Persaud, Dr. Coletta testified:

```
Q.   And so the manner in which Dr. Persaud used IVUS with
     [RE], it had zero clinical value, correct?
A.   In my opinion, correct.
Q.   And using the guide catheter the way he measured it,
     it resulted in a higher number on that picture that
     was printed out?
A.   It resulted in the creation of a number that was used
     to say that there was a high percentage of blockage in
     the left main artery.
```
(John Coletta Transcript (Doc# 177, Page ID 2222))emphasis
added.))

While openly criticizing Dr. Persaud's skill, medical practices, and judgments, and when

he was asked his **opinion** regarding whether the additional information Dr. Persaud relied upon

to make decisions regarding his patient [RE]'s Nuclear Stress Test, Dr. Coletta discounted such

information entirely and very pointedly concluded the following:

```
Q.   And in this case, you knew he had atrial fib, or you
     know by today he has had an atrial fib, he had a TIA,
     and that he had a father that died at 58.  Is it your
     opinion that none of those factors in any way had any
     weight at all?
A.   It is my opinion that none of those factors is an
     indication for a nuclear stress test.
```
(John Coletta Transcript (Doc# 177, Page ID 2247)(emphasis
added.))

    4.  <u>Purported "Lay" Testimony of Dr. Michael Dobrovich was Improper</u>

After Dr. John Coletta commenced his "investigation" into the practices and patient care

of Dr. Persaud, he took his findings to Dr. Michael Dobrovich, St. John's Chief Medical Officer.

Notably, it was Dr. Dobrovich that sent out letters to Dr. Persaud's patients, advising them that

Dr. Persaud may have unnecessarily given them stents.[13]  Although purportedly called as a "lay"

witness, Dr. Dobrovich's otherwise impermissible "opinion" testimony was clearly that of an

---

[13] The Government started its investigation after the local newspaper published an article regarding St.
John's letters to Dr. Persaud's patients.

29

"expert" witness.  Dr. Persaud's counsel failed to object to such testimony pursuant to FRE 702 and the law as set forth in <u>Daubert</u>.  Counsel further failed to object under FRE 701 based upon the fact that such testimony was impermissible "lay opinion" testimony.

In a bold attempt to paint Dr. Persaud as an incompetent practitioner, and while supposedly testifying as a "lay" witness, Dr. Dobrovich was impermissibly asked about Dr. Persaud's <u>"clinical thinking" and "impairment"</u>.  Dr. Persaud's counsel failed to object to such prejudicial and impermissible testimony, which was undoubtedly enhanced in the eyes of the jury based upon Dr. Dobrovich's position at St. John's and his *learned, authoritative* credentials.  Dr. Dobrovich was asked his **opinion** about Dr. Persaud's intellectual capabilities and testified:

```
     Q.    There was a point in time where you talked to
           Government representatives such as Mr. Corrigan here,
           and it was your opinion that Dr. Persaud had impaired
           clinical thinking, correct?
     A.    Correct.
     Q.    And you also felt that he did not do well with
           complexities?
     A.    Correct.
(Michael Dobrovich Transcript (Doc# 178, Page ID 2443)(emphasis
added.))
```

Understandably, many of the concepts being relied upon by both the Government and the defense were complicated.  The Government alleged that Dr. Persaud's chosen method for measuring stenosis was not the most updated method available.  Rather than explaining that different techniques are used by different physicians, and/or the fact that different techniques may have differing advantages depending upon the circumstance, the Government sought to convey to the jury that the "older" method used by Dr. Persaud (i.e. Intravascular Ultrasound instead of Fractional Flow Reserve) somehow enabled him to fabricate test results and diagnosis.

5. <u>Purported "Lay" Testimony of Dr. John Hiram Bezerra was Improper</u>

Purported "lay" witness, Dr. John Hiram Bezerra, another doctor who was involved for

30

the purpose of investigating the alleged medical practice errors of Dr. Persaud, testified that only 16 of the 190 patients whose records he reviewed had sufficient levels of stenosis to warrant the insertion of a stent. Dr. Bezerra's "opinion" testimony was clearly that of an "expert" witness. Dr. Persaud's counsel failed to object to such testimony pursuant to Federal Rules of Evidence 701 and 702 and <u>Daubert.</u>  Clearly acting as an expert witness, Dr. Bezerra criticized Dr. Persaud's use of IVUS (rather than FFR), and **opined that Dr. Persaud had improperly placed 174 out of 190 stents into his patients,** stating:

```
Q.   So the FFR gives you a better idea functionally
     whatever lesion is present, whatever percentage.  Is
     it really functionally interfering with the flow of
     blood at that area?
A.   That's correct, and we are building more and more
     evidence that that's probably today's gold standard in
     defining the need to have us stent someone, either we
     stent or bypass.
```
```
Q.   And where your results you have here on Government's
     Exhibit 216 of the 190 lesions that you looked at that
     Dr. Persaud placed the stent in, you were able to find
     that only 16 of them were actually over 70 percent
     stenosis.  Is that correct?
A.   That's correct.
```
```
(John Hiram Bezerra Transcript (Doc# 178, Page ID 2503)(emphasis
added.))
```

### 6. Purported "Lay" Testimony of Dr. Barry George was Improper

Using the "expert" analysis, findings, and conclusions obtained by another "expert" who had been involved in investigating Dr. Persaud's alleged medical practice errors, the Government elicited testimony of the "findings" of Dr. Barry George, after first focusing on his impressive experience, training, and credentials.[14]  The fact that Dr. George (who had been retained by St.

---

[14] Although not originally identified by the Government as an "expert" witness, there is some testimony that the Government compensated Dr. George, confusing the issue of whether he was being presented as a "lay" witness or an "expert" witness.  Regardless, Dr. George gave *either* impermissible "opinion" testimony or unqualified "expert" testimony under the Federal Rules of Evidence and <u>Daubert.</u>

John's Westshore to review Dr. Persaud's patient files) gave extensive <u>expert testimony</u> is

incontrovertible.  Dr. Persaud's counsel failed to object to such testimony pursuant to Federal

Rules of Evidence 701 and 702 and the law as set forth in <u>Daubert.</u>

     In an exchange that was obviously prejudicial to Dr. Persaud, "lay" witness Dr. Barry

George testified at length for the Government about his analysis and findings relative to Dr.

Persaud's medical practice and procedures.  While testifying regarding his expert analysis of Dr.

Persaud's allegedly "inappropriate" placement of a stent, Dr. George testified:

```
Q.   If we can go back to Government's Exhibit 210, August
     7th, 2012 summary letter, Dr. George. And we've
     already talked about this somewhat. Your analysis
     regarding the skill of Dr. Persaud in putting in the
     stents, even if there is a satisfactory outcome on an
     intervention, that doesn't mean that it, therefore,
     makes it appropriate to have placed the stent in the
     first place, does it?
A.   That is correct.
(Barry George Transcript (Doc# 186, Page ID 3726))
```

     Specifically related to one of the ultimate issues placed before the jury in the case against

Dr. Persaud, Dr. George was questioned about the **medical necessity** of Dr. Persaud's treatment

decisions regarding a particular patient:

```
Q.   And was it medically necessary to intervene on this
     blockage?
A.   My -- obviously here what I documented, it says that
     it is medically unnecessary based on information
     provided, and I checked that box and then I made the
     comment "Left internal mammary artery was patent,"
     meaning the bypass off the chest wall was feeding
     blood in the front part of the heart. And when I say
     "No trapped segments," what that means is that this
     bypass was coming down to the -- to the heart artery
     and it was supplying good blood flow to the entire
     front and side of the heart muscle. Therefore, there
     was no need for any stenting to be attempted.
Q.   Was this a situation where Dr. Persaud had put a
     stent in a patient who had previously had bypass
     surgery, is that what you're referring to?
A.   Yes. This patient had had previous bypass surgery,
```

```
                   that is correct. That's what the "LIMA" stands for,
                   left internal mammary artery, which is a conduit we
                   commonly use for bypass.
           Q.      And in this procedure you reviewed, Dr. Persaud
                   didn't use IVUS, but you found it medically
                   unnecessary for the reasons that you just indicated?
           A.      Correct.
(Barry George Transcript (Doc# 186, Page ID 3756-3757)(emphasis
added.)
```

Through use of continually leading questions by the Government, Dr. George was

improperly asked to testify regarding his **conclusions** (which were arrived at after completion of

his expert analysis) regarding the inappropriateness and non "necessity" of Dr. Persaud's

medical decisions as to how to properly treat his patient, Dr. George testified:

```
           Q.      And what did you find regarding the appropriateness
                   of intervention?
           A.      I felt that the appropriateness of the intervention
                   was not met, and I felt it was medically unnecessary
                   to proceed with intervention upon the bypass graft
                   blockage in question.
(Barry George Transcript (Doc# 186, Page ID 3757-3758)(emphasis
added.))
```

In another example of the wholly improper expert testimony elicited by the Government

concerning Dr. Persaud's allegedly improper use of certain testing procedures, Dr. George

provided conjecture relative to Dr. Persaud's improper "motives" for doing so, and whether there

was a "pattern" to Dr. Persaud's actions, Dr. George testified:

```
           Q.      Would it be fair to say you did find a pattern in
                   Dr. Persaud's actions with respect to these patients,
                   though?
                   MR. HILOW: Objection.
                   THE COURT: Overruled.
                   THE WITNESS: I can answer?
                   THE COURT: Yeah.
                   BY MS. RICE:
           Q.      Yes.
           A.      Yes, I did find a pattern of -- a primary pattern
                   that was of concern to me in the review of these cases
```

is that Dr. Persaud was using ultrasound,
intravascular ultrasound **in an inappropriate and
inadequate fashion  to determine whether or not
coronary stents were necessary in particular patients.**

Q. **So you found that Dr. Persaud was using IVUS in
cases that didn't need to go to IVUS?**

A. Sometimes, that is correct. Or that he may have
used intravascular ultrasound in patients that it was
appropriate to be using the intravascular ultrasound,
but that the ultrasound was misinterpreted.

Q. **And when you say "misinterpreted," does that include
your discussion about the IVUS was within the guide
catheter?**

A. **That is correct.**

(Barry George Transcript p. 1056-1036 (Doc# 186, Page ID 3758-
3759)(emphasis added.))

In the following exchange, the Government again improperly asked Dr. George regarding

Dr. Persaud's "motives" for using IVUS:

Q. Before I turn to this exhibit, I was **asking you
about the pattern** in the cases that you saw in your
review of Dr. Persaud. **Did you find that in the cases
when Dr. Persaud did use IVUS, that it resulted in him
coming up with a higher percentage of stenosis?**

A. **Yes.**

(Barry George Transcript p. 1037 (Doc# 186, Page ID
3760)(emphasis added.))

### 7.  Purported "Lay" Testimony of Dr. John Letcher was Improper

In the following protracted exchange, the Government questioned Dr. John Letcher about

his opinions regarding Dr. Persaud's "overestimation" of arterial blockage and his improper (and

allegedly incompetent) use of aortography, and the alleged reasons or "motives" for doing so.

Dr. Letcher, an interventional cardiologist from Toledo, was brought in by Southwest General to

review stent angiograms of Dr. Persaud's patients.

Without laying a proper foundation, and absent any qualification, the Government asked

Dr. Letcher regarding certain medical procedures that were commonly labeled as "drive-by"

34

procedures which the Government depicted as improper.  During this exchange, Dr. Letcher very

specifically concluded that Dr. Persaud's medical practices were not consistent with the accepted

"standard of practice" and that he overestimated stenosis and performed unnecessary procedures.

The testimony elicited by the Government was inappropriate and highly prejudicial.  It is

undeniable that Dr. Letcher's inadmissible "opinion" testimony was meant to be that of an

expert.  Dr. Persaud's counsel failed to object to such testimony pursuant to Federal Rules of

Evidence 701, 702, and <u>Daubert</u>.  In the role of an <u>expert</u> witness, Dr. Letcher testified as

follows:

> Q. **So seven of the 41 then just in 2011, and 2012 that you found to be overestimations and, therefore, inappropriate stents?**
>
> A. **Correct**
>
> Q. All right.  One of, as we stay with this first batch here and we're looking at Government's Exhibit 270, I want to talk about some of the other things that you found.  You talked about the overestimation on seven out of the 41.  One of the other things that you talked about was lack of indication for renal angiography and aortography in 7 of those 41?
>
> A. Yes.
>
> Q. **Let's start at a high level here.  What is renal angiography and aortography?**
>
> A. **It's a selective engagement of the renal artery to determine if there's a stenosis in the renal artery itself.**
>
> Q And how about the aortography?
>
> A. Most of those were complete aortographies from thoracic aorta through the abdomen aorta and he would pan down through the whole aorta.
>
> Q. **All right.  And let's start then with the aortography. When you say lack of indication for aortography in 17 of the 41, what are you looking for, what kind of indications?**
>
> A. **Specific reasons to do so.  You wouldn't necessarily do an aortography or an angiogram of the aorta or renal artery if you didn't have a specific indication for the finding.**
>
> Q. When you say "specific reasons" then, you're saying that when you do, let's say, a left heart cath, that

you don't automatically go in and do aortography as
well every time that you do that?

A.   No

Q.   And what types of specific indications than are you
looking for to say, "Okay, while I'm here, I'm also
going to do aortography"?

A.   Well, if there's signs or symptoms for an aortography
would be signs or symptoms of an aneurysm or
claudication or poor circulation to the lower
extremities.

Q.   And you didn't see any of those kinds of indications
then?

A.   They weren't provided, no.

Q.   How about the renal angiography, that's another that
it's not routine that when you're there, you may as
well do renal angiography?

A.   Correct

Q.   **That's not the standard of practice?**

A.   **No.**

Q.   What kind of indications do you need then to do renal
angiography?

A.   Usually a documentation of some noninvasive test of a
renal artery stenosis or malignant hypertension or
congestive heart failure and hypertension.

Q.   When you say "malignant hypertension" you're talking--

A.   very uncontrolled.  That's not controlled
hypertension, excuse me.

Q.   So just because you have high blood pressure doesn't
mean while you're there, you may as well do renal
angiography?

A.   Correct.

Q.   It has to be malignant?

A.   Or severe or significant, yes.

Q.   All right.

A.   Or not controlled.

Q.   **And so you found that there were lack of indications
for doing that in 17 of the 41 cases?**

A.   **Yeah, they were not provided.**

Q.   All right.  Is there a term in your practice of
cardiology for doing these types of tests while you're
there?

A.   I think you're looking for a work drive-by
angiography.  Is that what you're looking for?

Q.   Is that a term you're familiar with?

A.   Yes.

Q.   And when you day "drive-by," what does that mean?

a.   More or less because you're there, you do the

```
               procedure.
     Q.        All right.  And when you say when you're there and you
               do the procedure, you know as a practicing
               interventional cardiologist you get to charge extra
               for each one of those procedures, correct?
     A.        Yes.
     Q.        And so is drive-by kind of a way of saying, "This
               isn't go to take a whole lot of extra time; I can do
               it and get a separate billing out of it"?
     A.        I don't know if that's the rationale, but a lot of
               people do it because they're there and they're doing
               angiograms already.  Whether it's a financial
               incentive or not, sometimes it could be.
     Q.        All right.  But you're saying in terms of the standard
               of practice, you're supposed to have a reason to be
               there?
     A.        That's correct.
     Q.        Just because you happen to be in the neighborhood
               doesn't justify driving by and charging for these
               extra two types of tests?
     A.        That's correct.
     Q.        But that was something that you noticed here, that
               there were drive-bys occurring in this 41, the first
               batch of 41?
     A.        That's correct.
(John Letcher Transcript (Doc# 187, Page ID 3895-3900)(emphasis
added.))
```

And, while being improperly questioned about his **"findings"**, Dr. Letcher further

testified:

```
     Q.        And in the second batch here, as you look through your
               findings then on Government's Exhibit 272, your March
               3rd, 2013 letter back to Southwest General, you were
               able to find how many of the 44 cases to be
               inappropriate?
     A.        Eleven.
(John Letcher Transcript (Doc# 187, Page ID 3903-3904)(emphasis
added.))
```

Dr. Letcher was asked about his **opinion** whether the underlying Intravascular Ultrasound

tests that had been performed by Dr. Persaud substantiated the placement of stents.  Dr. Letcher

testified:

```
Q.    All right.  And in the record that you had available
      to you, the IVUS didn't substantiate placing that
      stent in that particular case?
A.    That's correct.
```

(John Letcher Transcript (Doc# 187, Page ID 3908)(emphasis
added.))

While criticizing Dr. Persaud's medical decision to insert a stent into his patient based

upon his reading of that patient's cardiac test results, Dr. Letcher harshly **concluded** the

following:

```
A.    The stress test did not show any evidence of ischemia
      apparently and there was noncritical coronary disease
      on the angiogram, not significant enough to intervene
      upon.
Q.    All right.  So with those two factors, you were able
      to say that was an inappropriate stent –
A.    Yes.
```
(John Letcher Transcript (Doc# 187, Page ID 3908-3909)(emphasis
added.))

Again, being specifically asked about his opinions and **"findings"** relative to the

underlying levels of stenosis of specific patients and Dr. Persaud's decisions to place stents, Dr.

Letcher testified at length as follows:

```
Q.    -- of those particular findings.  But what you did
      have before you was enough at least in eleven of those
      cases to say the degree of stenosis was overestimated
      by Dr. Persaud, is that correct?
A.    Yes.
```
(John Letcher Transcript p. 1187 (Doc# 187, Page ID
3910)(emphasis added.))

```
Q.    But when we get outside of the actual placement of the
      stent, you found problems with the decision to place
      the stent, is that correct?
A.    The indication, correct.
Q.    The indication.  So the estimation of stenosis and
      then ultimately the decision to place the stent is
      where the problem was?
A.    Correct.
```
(John Letcher Transcript p. 1188 (Doc# 187, Page ID

3911)(emphasis added.))

In another exchange related to the alleged inappropriateness of Intravascular Ultrasound as compared to Fractional Flow Reserve, the Government improperly suggested to Dr. Letcher that using Intravascular Ultrasound was evidence of a doctor's improper "motives" to fabricate test results.  Absent any objection by the defense, Dr. Letcher gave the following improper, wholly prejudicial, but nonetheless "expert"/"opinion" testimony in violation of FRE 701, 702:

```
Q.   You were asked some questions about IVUS and FFR and
     when FFR kind of came into more favor in use and
     practice.  Have you ever heard the phrase in your
     practice, "If you want to stent something, IVUS.  If
     you don't want to stent, FFR."
A.   Yeah, it's a common – it's a common discussion amongst
     interventionalists.
Q.   And as you answered that, you smiled a little bit.
     That is a phrase you're familiar with?
A.   Yes.
Q.   And can you explain that a little bit?
A.   You're looking at two different things.  One, you're
     looking at an anatomical picture, and the other you're
     looking at a functional picture.  Anatomically usually
     looks worse than it is functionally because you can
     make it look – it's based upon flow dynamics, and as
     the longer the lesion, the more appropriate –– the
     more significant it is.  And you don't see the length
     or you don't get a good sense of the length on IVUS.
     And so that changes the opinion on how you do things.
                         * * *
 Q.  And if you wanted that number high enough, does IVUS
     allow you to redraw lines and recalculate until you
     get a number that's theoretically high enough to
     justify doing a stent?
A.   Potentially
Q.   And you've used IVUS before?
A.   Yes.
Q    And you know that's something that can be done, the
     lines can be redrawn, you can recalculate and get
     higher numbers?
A.   Yes.
Q.   Tougher to do with FFR?
A.   You can't –– you can't change FFR.
```
(John Letcher Transcript (Doc# 187, Page ID 3954-3957))

8.  <u>Purported "Lay" Testimony of Dr. Joseph Cacchione was Improper</u>

Another "expert" witness, disguised as a "lay" witness, who had done an extensive

analysis of Dr. Persaud's medical procedures, Cleveland Clinic cardiologist Joseph Cacchione

was asked to testify regarding his team's extensive review of Dr. Persaud's work at Fairview

Hospital.  Dr. Cacchione testified as to many specialized, technical procedures and whether Dr.

Persaud's procedures were appropriate.  Dr. Cacchione and his team's analysis yielded

calculations which devastatingly concluded that the <u>actual percentage</u> of Dr. Persaud's proper

stenting procedures was only twenty percent (20%).  Indeed, such is not the proper testimony of

a "lay" witness.  Dr. Persaud's counsel failed to object to such testimony pursuant to Federal

Rules of Evidence 701 and 702 and the law as set forth in <u>Daubert</u>.  Dr. Letcher testified:

```
    Q.   So we're talking about the eighty cases that were
         analyzed.  How many of those did you find to fit
         the appropriate use criteria?
    A.   Sixteen.
    Q.   All right.  And so as a percentage of the total
         amount of stents that Dr. Persaud placed in 2011,
         how many did you find then to be appropriate?
    A.   Twenty percent.
(Joseph Cacchione Transcript (Doc# 187, Page ID 4005))
```

As noted above, and further detailed in the attached <u>Appendix A</u>, the jury was exposed to

an overpowering, overabundance of expert and opinion testimony from many accomplished

medical doctors.  Considering the complexity of the medical issues and the scientific theories

involved, the jury could not have been reasonably expected to discern what was expert testimony

and what was not.  The jury's exposure to this mass amount of scientific, technical, and

specialized evidence was the result of Dr. Persaud's counsel's ineffective assistance in failing to

object and failing to request this Court to *voir dire* each of the physician witnesses relative to

their proposed testimony.  This Court's failed to ensure that Dr. Persaud's constitutional rights

were protected and that Federal Rules of Evidence were followed.

The lack of any real distinction between the Government's "expert" and "lay" witnesses and the fact that "opinion testimony" was given by all such witnesses had to be overwhelming to the jury, giving it no choice but to conclude that Dr. Persaud did not know how to conduct proper tests, put in bad stents, put in unnecessary stents, misread arterial blockage percentages, engaged in conduct constituting falsity, etc., and did so for monetary gain.  It is inconceivable that the jury would not have been overwhelmed by such cumulative, prejudicial testimony from such impressive, educated, well-and qualified physician witnesses.  Under the circumstances, it would be natural for the jury to place greater weight on such testimony.  Considering the backgrounds, education, and credentials of the Government's physician witnesses, and the fact that the method of questioning such witnesses ("expert" versus "lay") was indistinguishable, it is probable <u>the jury believed each of these witnesses were "experts".</u>

This Honorable Court instructed the jury as follows regarding "expert" testimony admitted during trial:

> Now, certain expert testimony has been given in this case. **Men and women who are learned in special sciences** or -- I have a hard time with this word -- peculiarly -- I got it -- adapted to explain and elucidate a given state of facts in a case are called expert witnesses.
>
> **The purpose of such expert testimony is to assist the jury in judging facts in evidence** in order to bring such facts within the better understanding of the jury.
>
> Now, certain questions may have been propounded in this case and answers were given to them by those witnesses. In some of these questions, the facts embodied have been assumed by the witness to be true.
>
> First, if you find that the assumed facts forming the basis of an expert's opinion are not true and/or whether the assumed facts forming the basis of the expert's opinion are unreliable and/or not worthy of belief in your good judgment, then you may use such information to determine what credit, if any, you give to the testimony of such expert.

> **In other words, you should weigh and evaluate the testimony of expert witnesses by considering their background, knowledge, skill, and experience in the subject on which they have rendered an opinion, and considering whether the facts upon which that opinion was based were established to your satisfaction in the evidence.**
>
> You use all the other rules or comments I made on evaluating the testimony of expert witnesses just like you do anybody else. It's up to you to decide what testimony of any expert is worthy of belief or what testimony may not be.
>
> (Excerpt from Jury Instructions, Transcript (Doc # 195 Page ID 6520-6521) Emphasis added.)

In the instant case, none of the "expert" or "lay" physician witnesses presented by the Government were lacking in **background**, **knowledge,** or **skill**. That fact notwithstanding, these witnesses were not properly scrutinized by this Honorable Court and were permitted to give untested and/or inadmissible "opinion" testimony concerning complex medical procedures and principles. More critically, their proposed testimony was not determined to be relevant or admissible under the Federal Rules of Evidence. Counsel's failure to: 1) demand that "expert" witnesses be scrutinized under FRE 702; and 2) object to any opinion testimony from the Government's "lay" witnesses under FRE 701, was truly ineffective assistance, rising to the level of constitutional deficiency, causing Dr. Persaud extraordinary prejudice. Appellate counsel's failure to raise these issues on appeal was likewise ineffective and deficient.

In its decision affirming Dr. Persaud's convictions, the Sixth Circuit made it clear that Dr. Persaud's appellate arguments (based upon "sufficiency of the evidence") which related to the accuracy, inappropriateness, reliability, believability, etc. of the Government's expert witnesses, were unpersuasive. The Sixth Circuit specifically noted that the admissibility of expert testimony had not been challenged in the court below and further noted that there had been no argument "that the admission of the testimony of the government's expert witnesses

42

violated <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), which establishes

standards for the admissibility of expert-witness testimony in federal court."  *See,* <u>United States</u>

<u>v. Persaud</u>, 866 F.3d 371 (6th Cir. 2017), at page 12.

To establish prejudice, "[t]he defendant must show that there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." <u>Strickland</u>, 466 U.S. at 694.  In the instant case, there <u>is a reasonable probability</u> that,

<u>but for counsel's errors, the jury would have found Dr. Persaud not guilty</u>.  Here, trial and

appellate counsel were ineffective in failing to ensure that Movant Dr. Persaud received a fair

trial and appellate consideration.  Absent any challenge to the multitude of Government

"experts" Dr. Persaud suffered obvious and actual prejudice.  This Court's failure to act as

"gatekeeper" to protect Dr. Persaud also caused him prejudice.  There was no appropriate

qualification of these witnesses; no test of their *methodology*; and no determinations made as to

the "fit" of their proposed testimony as required under FRE 702 and <u>Daubert</u>.  Additionally, the

Government's presentation of "expert" witnesses, disguised as "lay" witnesses in violation of

FRE 701 caused overwhelming prejudice.  Counsel were *constitutionally deficient in* failing to

object to the presentation of such witnesses and the admission of their improper testimony.

> *GROUND TWO:*
> *COUNSEL WERE INEFFECTIVE FOR FAILING TO PROPERLY*
> *OBJECT TO "AMOUNT OF LOSS" CALCULATIONS, AND FOR*
> *FAILING TO RAISE ON APPEAL THAT "AMOUNT OF LOSS"*
> *CLAIMED BY THE GOVERNMENT AND ITS EXPERTS WAS*
> *BASED UPON ERRONEOUS FACTS AND WAS IMPROPERLY*
> *CALCULATED, RENDERING DR. PERSAUD'S RESULTING*
> *SENTENCE INSUPPORTABLE, UNCONSTITUTIONAL, AND*
> *ILLEGAL.*

In the instant case, the total "amount of loss" was erroneously determined to be 29.9

Million Dollars.  That total called for a 22-level increase in the offense level under the applicable

Sentencing Guidelines.  (USSG §2B1.1(b)(1)(L).  The 29.9 Million Dollar "amount of loss" was wholly speculative.  It was not factual, not *measurable*, and not a "reasonable" or "sufficient" estimate based upon the evidence presented at trial.

The Government's method for calculating Dr. Persaud's alleged overbilling numbers is without foundation.  Such method, and the calculations made were improperly based upon: a) a *non-random sample*; b) non-verifiable computations; c) admittedly overstated "intended loss" figures; d) unreasonable conclusions (by a non-physician regarding "appropriate" treatment); e) flawed extrapolation and analysis; f) insupportable assumptions regarding payment protocol; g) results not based on measurable evidence subject to accepted scientific and mathematical principles; and, h) results which could not be rectified with the evidence and the jury's findings of actual "gain".  The failures present in the Government's and the Federal Probation Department's calculations render the "amount of loss" unreliable.  The Government's method for computing "loss" is erroneous and cannot be replicated.  Accordingly, such method abrogates due process, the United States Sentencing Guidelines, the purposes of federal sentencing, and the sentencing obligations of this Honorable Court.  The resulting sentence is illegal.

As state and federal trial courts move inexorably toward utilizing, and presuming the reliability and qualifications, of a tsunami of "experts", the judicial mantle of authority is being thrown to the sideline, and the jury's constitutional role as fact-finder is slowly becoming subjugated to the testimony of hired experts.  Counsel for Movant respectfully asserts that the Fourth, Fifth, and Sixth Amendment protections afforded accused citizens will disappear if not vigorously guarded by the judiciary.  This Honorable Court cannot permit the wholesale surrender of constitutional protections to self-proclaimed experts who are not properly vetted, whose methodology is not deemed reliable, and whose testimony is prejudicial, cumulative, and

44

not determined to be "helpful" to the trier of fact as required by law.

V.  CONCLUSION

Based upon all of the foregoing, Movant Dr. Persaud and his counsel herein respectfully move this Honorable Court to Vacate and Set Aside his Judgment of Conviction and Sentence.

VI.  REQUESTED RELIEF

WHEREFORE, based upon all of the foregoing, Movant Dr. Persaud herein prays for the following relief:

1.  Vacation of Movant Harold Persaud's Judgment of Conviction;

2.  Vacation of Movant Harold Persaud's Sentence;

3.  A New Trial for Movant Harold Persaud;

4.  An Evidentiary Hearing;

5.  Discovery proceedings related to the facts and issues addressed herein;

6.  An opportunity to present further briefing to this Court;

7.  A Hearing for purposes of calculating "amount of loss"; and

8.  Any and all other relief which this Honorable Court determines to be just, equitable, and proper.

Respectfully submitted,

*/s/ Richard G. Lillie /s/ Gretchen A. Holderman*
RICHARD G. LILLIE (390023744)
GRETCHEN A. HOLDERMAN (390058508)
LILLIE & HOLDERMAN
2003 St. Clair Avenue
Cleveland, Ohio 44114
T: (216) 861-1313 / F: (216) 861-1314
rlillie@lillieholderman.com
gholderman@lillieholderman.com

CERTIFICATE OF SERVICE

This is to certify that the foregoing was filed electronically on the 8th day of June 2018, in accordance with the Court's Electronic Filing System. Parties may access this filing through the Court's filing system.

*/s/ Richard G. Lillie /s/ Gretchen A. Holderman*
RICHARD G. LILLIE (390023744)
GRETCHEN A. HOLDERMAN (390058508)